UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MOMENTIVE PERFORMANCE
MATERIALS USA, INC.,

              **Plaintiff,**

            v.                                     1:07-CV-567
                                                         (FJS/DRH)

ASTROCOSMOS METALLURGICAL, INC.;
CARBONE LORRAINE EQUIPMENTS
GENIE CHIMIQUE; and ABC
CORPORATION(S) 1 THROUGH 10,

              **Defendants.**
_____

**APPEARANCES**                                    **OF COUNSEL**

**PODVEY MEANOR, CATENACCI,**      **J. BARRY COCOZIELLO, ESQ.**
**HILDNER, COCOZIELLO &**            **ANTHONY M. RAINONE, ESQ.**
**CHATTMAN**                                 **THOMAS G. ALJIAN JR., ESQ.**
One Riverfront Plaza
8th Floor
Newark, New Jersey 07102
Attorneys for Plaintiff

**RIKER DANZIG SCHERER**            **HAROLD L. KOFMAN, ESQ.**
**HYLAND PERRETTI LLP**             **ANTHONY J. SYLVESTER, ESQ.**
One Speedwell Avenue                 **NEENA BARUA, ESQ.**
P.O. Box 1981
Morristown, New Jersey 07962-1981
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

     Currently before the Court is Defendant Carbone Lorraine Equipments Genie Chimique's ("CLEGC") motion to dismiss Plaintiff's claims against it. Defendant CLEGC argues for

dismissal of Plaintiff's claims for tortious interference with contract and tortious interference with business relations on the grounds that Plaintiff's claims are not plausible and that Plaintiff cannot state a claim that Defendant CLEGC tortiously interfered with its subsidiary's contract.

## BACKGROUND[1]

Although Plaintiff's amended complaint includes ten causes of action, it asserts only two of them against Defendant CLEGC: (1) the fifth cause of action for tortious interference with contractual relations and (2) the sixth cause of action for tortious interference with business relations. *See generally* Amended Complaint. According to Plaintiff's amended complaint, all of its causes of action arise from the following facts.

In 1997, the Silicones business unit of General Electric Company ("GE") issued a request for proposal ("RFP") to various potential suppliers for the design, manufacture and installation of a weak acid reactor at GE's Waterford, New York facility. *See id.* at ¶ 7. In response to the RFP, Defendant AstroCosmos offered to design, manufacture, inspect, test and install a "tantalum-lined weak acid reactor." *See id.* at ¶ 10. GE informed Defendant AstroCosmos that it would use the weak acid reactor to recover waste hydrochloric acid and convert it for reuse at the Waterford facility. *See id.* at ¶ 11. Defendant AstroCosmos represented to GE that it could design, manufacture, inspect, test and install a tantalum-lined weak acid reactor that would perform in a superior manner compared to a brick-lined weak acid reactor. *See id.* at ¶ 12. Defendant AstroCosmos also represented that a tantalum-lined weak acid reactor could be used to recover

---

[1] Since this is a motion to dismiss, the Court has derived these facts from the allegations in Plaintiff's amended complaint.

and convert waste hydrochloric acid at the required temperatures and pressures for reuse at the Waterford Facility. *See id.* at ¶ 13. Finally, Defendant AstroCosmos represented several times in writing that it had manufactured several tantalum-lined reactors of the size and type contained in GE's RFP. *See id.* at ¶ 14.

As a result of their negotiations, Defendant AstroCosmos prepared a final quotation for the design, manufacture, inspection, testing and installation of a tantalum-lined weak acid reactor for GE to convert hydrochloric acid for reuse at the Waterford Facility. *See* Amended Complaint at ¶ 15. In reliance on the representations and warranties contained in Defendant AstroCosmos' final quotation, GE agreed to purchase a tantalum-lined weak acid reactor from Defendant AstroCosmos. *See id.* at ¶ 16. Therefore, GE and Defendant AstroCosmos executed an equipment purchase agreement dated October 29, 1999 ("Purchase Agreement") for one tantalum-lined weak acid reactor ("equipment"); the Purchase Agreement incorporated the final quotation that Defendant AstroCosmos had prepared and required that time was of the essence for the delivery of the equipment. *See id.* at ¶ 17.

The Purchase Agreement contained implied warranties of merchantability, fitness for a particular purpose and warranties arising from course of dealing or usage of trade. *See id.* at ¶ 18. The Purchase Agreement also contained several express warranties, including a performance warranty that the equipment would perform in accordance with the performance requirements as set forth in the specifications, that the equipment would be designed and manufactured to conform to the specifications, and that the equipment would be merchantable, of good material and workmanship, free from defects and fit and sufficient for the intended purpose. *See id.* at ¶ 19.

Plaintiff is the assignee of all of GE's rights, title and interest in the Purchase Agreement and is the sole member of the current owner in fee simple of the Waterford Facility, MPM Silicones, LLC. *See* Amended Complaint at ¶ 20. Defendant AstroCosmos delivered and installed one tantalum-lined vessel in April or May 2001. *See id.* at ¶ 21. Due to Defendant AstroCosmos' fault, the delivery and installation of the tantalum-lined vessel were behind the schedule set forth in the Purchase Agreement. *See id.* at ¶ 22.

Since its installation in 2001, the tantalum-lined vessel has never functioned according to the terms of the Purchase Agreement and has been shut down on numerous occasions for repair. *See id.* at ¶ 23. The vessel failed within the first eleven months of operation and had to be shut down for repairs. *See id.* at ¶ 24. Since that first shut down in April 2002 to the filing of the complaint, the vessel has never operated continuously for a period of more than ten months. *See id.* at ¶ 25. Defendant AstroCosmos has undertaken several repair attempts on a number of occasions between April 2002 and May 2006. *See id.* at ¶ 26. Since it installed the vessel in 2001, Defendant AstroCosmos has replaced several parts of the vessel. *See id.* at ¶ 27. Defendant AstroCosmos paid for the replacement parts and repairs, acknowledging that the problems were due to its conduct and were its responsibility. *See id.* at ¶ 28.

On repeated occasions in March 2005 and thereafter, Defendant AstroCosmos admitted that the vessel was manufactured in a defective manner and that it could not function for its intended and/or particular purpose. *See id.* at ¶ 29. In March 2005 and on several occasions thereafter, GE requested that Defendant AstroCosmos replace the vessel. *See id.* at ¶ 30.

In July 2005, Defendant AstroCosmos modified the Purchase Agreement and provided an additional warranty of future performance for one year from June 2005 that, if the vessel failed

within one year, Defendant AstroCosmos would replace the vessel. *See id.* at ¶ 31. The vessel failed shortly after June 2005, and GE asked Defendant AstroCosmos to manufacture and deliver a new vessel. *See id.* at ¶ 32.

During 2005, GE and Defendant AstroCosmos had several meetings regarding the design, manufacture, inspection, testing, installation and operation of a replacement vessel to be supplied at Defendant AstroCosmos' cost. *See* Amended Complaint at ¶ 33. In or around November 2005, GE and Defendant AstroCosmos came to an agreement relating to the replacement vessel ("Replacement Agreement"). *See id.* at ¶ 34. The Replacement Agreement provided that Defendant AstroCosmos would design, manufacture, inspect, test and install a replacement tantalum-lined weak acid reactor with what Defendant AstroCosmos described as "better technology" and continue to repair the existing vessel until the replacement vessel could be installed. *See id.* at ¶ 35.

The Replacement Agreement also provided that, in exchange for Defendant AstroCosmos' agreement to provide a new tantalum-lined weak acid reactor and for continuing to repair the existing one, GE would award Defendant AstroCosmos, Defendant CLEGC and certain of their affiliates preferred vendor status for identified projects. *See id.* at ¶ 36.

From November 2005 through May 2006, GE and Defendant AstroCosmos had several meetings about the design, manufacture, inspection, testing, installation and operation of the replacement vessel under the terms of the Replacement Agreement; Defendant AstroCosmos began performance under the terms of the Replacement Agreement; and GE awarded certain projects to Defendant AstroCosmos, Defendant CLEGC and/or certain of their affiliates pursuant to the preferred vendor status arrangement. *See id.* at ¶ 37. Plaintiff is the assignee of GE's

rights, title and interest in the Purchase Agreement and in the Replacement Agreement. *See id.* at ¶ 38.

In or around April 2006, Defendant CLEGC requested an inspection of the existing vessel at the Waterford Facility. *See* Amended Complaint at ¶ 40. In or around May 2006, Defendants AstroCosmos and CLEGC conducted an inspection of the existing vessel at the Waterford Facility. *See id.* at ¶ 41. On or about May 18, 2006, Defendant AstroCosmos' repair crew arrived at the Waterford Facility to begin a round of repairs, which Defendant AstroCosmos had estimated would take four to five weeks to complete. *See id.* at ¶ 42.

In or around June 2006, GE met with Defendants AstroCosmos and CLEGC. At that meeting, Defendants AstroCosmos and CLEGC took the position for the first time that GE was at fault for the performance failures because of the hydrochloric acid process that GE conducted in the tantalum-lined vessel. *See id.* at ¶ 43. These were the same performance failures that Defendant AstroCosmos had previously admitted were due solely to its defective manufacturing. *See id.* After that meeting, Defendant AstroCosmos refused to design, manufacture, inspect and test the replacement tantalum-lined weak acid reactor and refused to continue to repair the existing vessel as required under the terms of the Replacement Agreement. *See id.* at ¶ 44. Defendant AstroCosmos refused to perform under the terms of the Replacement Agreement at the direction and command of Defendants CLEGC and/or ABC Corporations. *See id.* at ¶ 45.

In addition to incorporating these allegations by reference, Plaintiff specifically alleges in Count Five that the Purchase Agreement and Replacement Agreement were valid contracts between GE and Defendant AstroCosmos. *See id.* at ¶ 86. At all relevant times, Defendant CLEGC and/or ABC Corporations had knowledge of the existence and terms of these

Agreements. *See id.* at ¶ 89. Defendant AstroCosmos breached the Purchase Agreement and the Replacement Agreement by failing to design, manufacture, inspect, test and install a replacement vessel and by failing to continue to repair the existing vessel until completion of the design, manufacture, inspection, testing and delivery of the replacement vessel. *See id.* at ¶ 90. Defendants CLEGC and/or ABC Corporations procured Defendant AstroCosmos' breach of the Purchase Agreement and the Replacement Agreement without justification. *See id.* at ¶ 91.

Finally, in addition to incorporating all previous allegations by reference in Count Six, Plaintiff specifically alleges that, at all relevant times, GE and Defendant AstroCosmos had business relations and that Defendants CLEGC and/or ABC Corporations were aware of those relations. *See id.* at ¶¶ 95-96. Defendants CLEGC and/or ABC Corporations interfered with those business relations by wrongful means, including, but not limited to, fraud, misrepresentation, and/or economic pressure. *See id.* at ¶¶ 97-98. By using these wrongful means, Defendants CLEGC and/or ABC Corporations intended to and did cause Defendant AstroCosmos to breach the Purchase Agreement and Replacement Agreement with GE, which caused damage to Plaintiff. *See id.* at ¶¶ 99-100.

### III. DISCUSSION

**A.     The standard of review**

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As the Supreme Court explained in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Rule 8's pleading standard does not require "detailed factual allegations," but it does

require "more than labels and conclusions, and a formulaic recitation of a cause of action . . . ." *Id.* at 555 (citation omitted). Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, No. 07-1015, 129 S. Ct. 1937, 1949 (2009) (quoting [*Twombly*, 550 U.S.], at 557, 127 S. Ct. 1955).

As the Supreme Court recently held in *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting [*Twombly*, 550 U.S.], at 570, 127 S. Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing [*Twombly*, 550 U.S.], at 557, 127 S. Ct. 1955).

Furthermore, the Court explained that there are "[t]wo working principles [that] underlie [its] decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions . . . [and] [s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . ." *Iqbal*, 129 S. Ct. at 1949-50 (internal citations omitted). Furthermore, the Court stated that

> [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2)."

*Id.* at 1950.

Finally, the Court instructed that, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an

entitlement to relief." *Id.*

Applying this two-part plausibility standard, the Court must now determine whether Plaintiff's claims against Defendant CLEGC are sufficient to withstand the pending motion to dismiss.

### B. Plaintiff's tortious interference with contract and tortious interference with business relations claims

"A claim of tortious interference [with contract] requires proof of (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages[.]" *Foster v. Churchill*, 87 N.Y.2d 744, 749-50 (1996) (citing *Israel v Wood Dolson Co.*, 1 NY2d 116, 120); *see also Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 154 (S.D.N.Y. 2007) (citations omitted).

To state a claim for tortious interference with business relations, a plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003) ("*Carvel I*") (citing *Goldhirsh Group, Inc. v . Alpert*, 107 F.3d 105, 108-09 (2d Cir. 1997); *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994)).

As noted above, in its amended complaint, Plaintiff alleges, among other things, (1) that the Purchase Agreement and Replacement Agreement were valid contracts between GE and Defendant AstroCosmos; (2) that Defendant CLEGC had knowledge of these Agreements; (3)

that Defendant AstroCosmos breached these Agreements by failing to design, manufacture, inspect, test and install a replacement vessel and by failing to continue to repair the existing vessel until completion of the design, manufacture, inspection, testing and delivery of the replacement vessel; (4) that Defendant CLEGC procured Defendant AstroCosmos' breach of these Agreements, and (5) that Plaintiff suffered damages as a result. *See generally* Amended Complaint. In addition, Plaintiff asserts that Defendant CLEGC interfered with GE's contractual and business relations with Defendant AstroCosmos through wrongful means, including, but not limited to, fraud, misrepresentations, and/or economic pressure. *See id.* at ¶¶ 98-99.

Defendant CLEGC relies on two interrelated theories to support its motion to dismiss both of Plaintiff's tortious interference claims: (1) the economic interest defense and (2) the defense that, because Defendant CLEGC and Defendant AstroCosmos are sister companies, Plaintiff cannot hold Defendant CLEGC liable for interfering with the contractual and/or business relationship between GE and Defendant AstroCosmos because any such interference results from Defendant CLEGC's attempt to protect its own economic interests.

The fatal flaw of relying on either of these theories to support a motion to dismiss is that they are **defenses** to Plaintiff's claims, on which Defendant CLEGC has the burden of proof. In considering this motion to dismiss, however, the Court must accept as true all of the well-pleaded allegations in Plaintiff's amended complaint and draw all reasonable inferences in Plaintiff's favor. Thus, as long as Plaintiff's allegations are sufficient to state facially plausible claims for tortious interference, the Court cannot grant Defendant CLEGC's motion to dismiss based on Defendant CLEGC's mere assertion of the business justification defense. Nor, despite Defendant CLEGC's assertions to the contrary, do any of the cases that it cites that have addressed this

defense hold otherwise.

In *Foster*, the issue was whether the TA defendants, a group of venture capital firms whose principals were directors of another defendant, Microband, caused Microband to breach its employment agreements with the plaintiffs. After a non-jury trial, the trial court dismissed all the claims against the TA defendants, despite finding that those defendants had intentionally caused Microband to breach its employment agreements with the plaintiffs. Before dismissing these claims, the trial court concluded that, with respect to the claim of tortious interference, the TA defendants "were protected by the defense of economic justification [because] . . . the predominate purpose of [the TA defendants'] actions was the economic interest of Microband." *Id.* at 749. The Appellate Division affirmed, concluding that the TA defendants "had established the defense of economic justification and had acted with no personal animus." *Id.* The plaintiffs appealed, contending that the Appellate Division had erred by requiring them to establish that the TA defendants acted with personal animus to defeat their defense of economic justification. *See id.*

After reciting the elements of a claim of tortious interference with contract and noting that the plaintiffs had proven these elements, the Court of Appeals also found that the TA defendants had established the defense of economic justification. *See id.* at 750. Furthermore, the Court of Appeals concluded that,

> [c]ontrary to the argument of the [plaintiffs], the Appellate Division did not require [them] to establish personal animus to defeat the defense of economic justification. . . . Thus the Appellate Division . . . properly relied on this Court's holding in *Felsen v Sol Café Mfg. Corp*. (24 NY2d 682 . . .), that economic interest is a defense to an action for tortious interference with a contract unless there is a showing of malice or illegality.

-11-

*Id.*²

Furthermore, although Defendant CLEGC correctly notes that, in *Multi-Juice S.A. v. Snapple Beverage Corp.*, No. 02 Civ. 4635, 2003 WL 1961636 (S.D.N.Y. Apr. 25, 2003), the court granted a motion to dismiss a tortious interference claim based on the economic justification defense, neither of the cases on which that court relied support the proposition that the mere assertion of that defense is a sufficient basis on which to grant a motion to dismiss.

In *Multi-Juice*, the court noted that a party "'cannot tortiously interfere with its own contract'" and held that, because "Mistic was its wholly-owned subsidiary . . ., Snapple could not tortiously interfere with the distribution agreement." *Multi-Juice*, 2003 WL 1961636, at *5 (citing *Koret, Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156, 157, 554 N.Y.S.2d 867 (N.Y. App. Div. 1990) (finding that a corporate parent has the right to interfere with the contract of its subsidiary, in order to protect its economic interests); *MTI/The Image Group, Inc. v. Fox Studios East, Inc.*, 262 A.D.2d 20, 690 N.Y.S.2d 576, 579 (N.Y. App. Div. 1999) (noting that it was an error not to dismiss a tortious interference claim where all named companies were either parent

---

² Plaintiff appears to argue that the economic justification defense is not applicable to a tortious interference with contract claim. There is some case law that would appear to support Plaintiff's position. In *Island Rehabilitative Servs. Corp. v. Maimonides Med. Ctr.*, 2008 WL 786507 (Sup. Court, Kings County, 2008), to be published at 19 Misc. 3d 1108(A), the court held that the economic interest defense is inapplicable to tortious interference with contract claims. *See id.* at *8 (quoting *Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, 35 AD3d 317, 318 [2006]) (other citations omitted). Specifically, the court stated that the economic justification defense "is not applicable . . . where the contract is valid and enforceable and known to the defendant that intentionally seeks its breach for its own economic advantage." *Id.* The Court does not need to address this issue to decide this motion, however, because as discussed *infra*, even if the economic justification defense applies to such claims, Defendant CLEGC's assertion of that defense is not a sufficient basis for granting its motion to dismiss Plaintiff's claims against it.

or sister companies)).

Neither *Koret* nor *MTI/The Image Group*, the two cases on which the court relied in *Multi-Juice*, concerned a motion to dismiss. In *Koret*, the jury had awarded the plaintiff damages for breach of a joint venture agreement and for tortious interference with that agreement. On appeal, the court, among other things, vacated the judgment with respect to the tortious interference claim. The court reasoned that

> the award to plaintiff of $500,000 against defendant Dior-Paris for tortious interference with the joint venture agreement between Dior-Paris' wholly owned subsidiary, Dior-New York, and plaintiff should be vacated, since the weight of the evidence clearly indicates that Dior-Paris, as the corporate parent, had a right to interfere with the contract of its subsidiary in order to protect its economic interest (*Felsen v Sol Café Mgf. Corp.*, 24 NY2d 682, 687 [1969]). Dior-Paris was no stranger to the joint venture agreement, in view of the fact that Mr. Rouet, who was both managing director of Dior-Paris and chairman of Dior-New York, played a role in negotiation of the joint venture agreement and executed same. It is well established that only a stranger to a contract, such as a third party, can be liable for tortious inference with a contract . . . .

*Koret, Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156, 157 (1st Dep't 1990) (internal citations omitted).

In *MTI/The Image Group*, the state supreme court had granted the defendants' motion for partial summary judgment dismissing the tortious interference with contractual relations and prospective economic advantage causes of action. On appeal, the court concluded that it was

> error not to dismiss the third cause of action, for tortious interference with contractual relations and prospective economic advantage, since all the named companies are affiliated with Morning Studio, either as parent or sister companies, and thus had an economic interest, MTI failed to demonstrate malice, and the corporate agents who allegedly committed the tort were simultaneously acting as agents (in negotiating and executing the

contracts) of Morning Studios, the signatory to the contracts . . . .

*MTI/The Image Group, Inc. v. Fox Studios East, Inc.*, 262 A.D.2d 20, 23-24 (1st Dep't 1999) (internal citations omitted).

As both *Koret* and *MTI/The Image Group* make clear, a defendant cannot defeat a tortious interference claim simply by asserting an economic interest defense. Rather, the defendant has to prove that the defense applies, i.e., that, even assuming that the defendant is affiliated with the party with whom the plaintiff has the relationship, the defendant interfered with that relationship to protect its economic interest. Furthermore, once the defendant meets its burden to prove that the economic interest defense applies, the plaintiff can still prevail if it can prove that the defendant acted out of malice or fraudulently or illegally interfered with the contractual or business relationship.

Furthermore, Defendant CLEGC appears to overlook the fact that there is no legal support for the proposition that the mere assertion of the economic justification defense or the fact that Defendant CLEGC and Defendant AstroCosmos are affiliated companies, as a matter of law, defeats Plaintiff's tortious interference claims. In addition, there is a factual dispute about the relationship between Defendant CLEGC and Defendant AstroCosmos that the Court cannot resolve on a motion to dismiss, particularly since it is Defendant CLEGC's burden to prove that such a relationship exists and the extent of that relationship.[3] Moreover, Defendant CLEGC

---

[3] In his Declaration, Vincent Juillard, who is "employed in the Legal Department of Carbone Lorraine Corporate Services, Inc., which is a wholly-owned subsidiary of Le Carbone Lorraine, S.A. ("Le Carbone Lorraine"), states that "CLEGC is a wholly-owned subsidiary of Le Carbone Lorraine. Le Carbone Lorraine also owns 100% of the shares of stock issued for Carbone Corporation. That entity, together with Carbone Lorraine North America, own 100% of the outstanding stock of defendant Astrocosmos Metallurgical, Inc. ("Astrocosmos")." *See* Declaration of Vincent Juillard dated December 6, 2007, at ¶¶ 1, 3.

(continued...)

bears the burden to prove that it interfered with GE's contractual and/or business relationship with AstroCosmos to protect its own economic interest.  Finally, assuming that Defendant CLEGC meets this burden, Plaintiff may still be able to overcome this defense if it can prove that Defendant CLEGC acted out of malice or employed fraudulent or illegal means to interfere with the relationship between GE and Defendant AstroCosmos.

Therefore, based on the factual allegations in Plaintiff's complaint, and drawing all reasonable inferences therefrom in Plaintiff's favor, the Court concludes that Plaintiff's complaint has "'nudged [its] claims' of [tortious interference with contract and tortious interference with business relations] 'across the line from conceivable to plausible.'"  *Iqbal*, 129 S. Ct. at 1951 (quotation omitted).  Furthermore, the Court concludes that Defendant CLEGC's assertion of the economic justification defense and its alleged affiliation with Defendant AstroCosmos are insufficient to defeat these facially plausible claims.

## IV. CONCLUSION

After carefully reviewing the entire file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

---

[3](...continued)
Plaintiff counters these statements with the following information, which was included in the 2007 Interim Report of Le Carbone Lorraine SA.  *See* Plaintiff's Memorandum of Law at 3.  Defendant CLEGC "is a wholly owned subsidiary of Le Carbone Lorraine, SA."  *See id.*  "Le Carbone Lorraine SA only owns 62.3% of the shares of stock of Carbone Corporation, and C.L.N.A. owns the remaining shares of stock of Carbone Corp."  *See id.*  "Carbone Corporation owns 100% of the stock of AstroCosmos whereas Carbone Lorraine does not own any interest in AstroCosmos."  *See id.*  Thus, "[t]he 2007 Interim Report shows that CLEGC is owned 100% by Le Carbone Lorraine SA, but CLEGC does not have any ownership interest or parent-subsidiary relationship with AstroCosmos."  *See id.* at 4.

**ORDERS** that Defendant CLEGC's motion to dismiss Plaintiff's tortious interference claims is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 1, 2009
       Syracuse, New York

                                        Frederick J. Scullin, Jr.
                                        Senior United States District Court Judge