**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MOMENTIVE PERFORMANCE**
**MATERIALS USA, INC.,**

                                **Plaintiff,**

                        **v.**                                        **1:07-CV-567**
                                                                      **(FJS/DRH)**

**ASTROCOSMOS METALLURGICAL, INC.;**
**CARBONE LORRAINE EQUIPEMENTS**
**GENIE CHIMIQUE; and ABC**
**CORPORATION(S) 1 THROUGH 10,**

                                **Defendants.**
_____

**APPEARANCES**                                **OF COUNSEL**

**PODVEY MEANOR, CATENACCI,**           **ROBERT J. MCGUIRE, ESQ.**
**HILDNER, COCOZIELLO &**               **J. BARRY COCOZIELLO, ESQ.**
**CHATTMAN**                            **ANTHONY M. RAINONE, ESQ.**
One Riverfront Plaza
8th Floor
Newark, New Jersey 07102
Attorneys for Plaintiff

**RIKER, DANZIG, SCHERER,**             **HAROLD L. KOFMAN, ESQ.**
**HYLAND & PERRETTI LLP**
Headquarters Plaza
One Speedwell Avenue
P.O. Box 1981
Morristown, New Jersey 07962-1981
Attorneys for Defendant AstroCosmos
Metallurgical, Inc.

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Currently before the Court is Defendant AstroCosmos Metallurgical Inc.'s

("AstroCosmos") motion to dismiss Plaintiff's amended complaint pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure.[1]  The Court heard oral argument in support of, and in

opposition to, this motion on August 13, 2009, and reserved decision.  The following constitutes

the Court's resolution of the pending motion.


## II. BACKGROUND[2]

In its amended complaint, Plaintiff asserts eight causes of action against Defendant

AstroCosmos: (1) breach of the 1999 Purchase Agreement, (2) breach of the 2005 Replacement

Agreement, (3) fraudulent inducement pertaining to the 1999 Purchase Agreement, (4) negligent

misrepresentation relating to the 1999 Purchase Agreement, (5) professional negligence and

engineering malpractice, (6) strict products liability, (7) breach of implied warranties, and (8)

breach of express warranties.  *See* Amended Complaint at Counts 1, 2, 3, 4, 7, 8, 9, 10,

respectively.

In 1997, the Silicones business unit of General Electric Company ("GE") issued a request

for proposal ("RFP") to various potential suppliers for the design, manufacture and installation of

a weak acid reactor at GE's Waterford, New York facility.  *See id.* at ¶ 7.  In response to the RFP,

Defendant AstroCosmos offered to design, manufacture, inspect, test and install a "tantalum-

─────────────────

[1] Plaintiff filed an amended complaint as of right after Defendant AstroCosmos filed its
motion to dismiss.  Since the amended complaint supersedes and replaces the original complaint,
the Court has analyzed Defendant AstroCosmos' motion with reference to the amended
complaint.

[2] Since this is a motion to dismiss, the Court has derived these facts from the allegations
in Plaintiff's amended complaint.  Furthermore, for purposes of this motion only, Defendant
AstroCosmos does not dispute these allegations.

lined weak acid reactor." *See id.* at ¶ 10.  GE informed Defendant AstroCosmos that it would use the weak acid reactor to recover waste hydrochloric acid and convert it for reuse at the Waterford Facility.  *See id.* at ¶ 11.  Defendant AstroCosmos represented to GE that it could design, manufacture, inspect, test and install a tantalum-lined weak acid reactor that would perform in a superior manner compared to a brick-lined weak acid reactor.  *See id.* at ¶ 12.  Defendant AstroCosmos also represented that a tantalum-lined weak acid reactor could be used to recover and convert waste hydrochloric acid at the required temperatures and pressures for reuse at the Waterford Facility.  *See id.* at ¶ 13.  Finally, Defendant AstroCosmos represented several times in writing that it had manufactured several tantalum-lined reactors of the size and type contained in GE's RFP.  *See id.* at ¶ 14.

As a result of their negotiations, Defendant AstroCosmos prepared a final quotation for the design, manufacture, inspection, testing and installation of a tantalum-lined weak acid reactor for GE to convert hydrochloric acid for reuse at the Waterford Facility.  *See* Amended Complaint at ¶ 15.  In reliance on the representations and warranties contained in Defendant AstroCosmos' final quotation, GE agreed to purchase a tantalum-lined weak acid reactor from Defendant AstroCosmos.  *See id.* at ¶ 16.  Therefore, GE and Defendant AstroCosmos executed an equipment purchase agreement dated October 29, 1999 ("Purchase Agreement") for one tantalum-lined weak acid reactor ("Equipment"); the Purchase Agreement incorporated the final quotation that Defendant AstroCosmos had prepared and required that time was of the essence for the delivery of the Equipment.  *See id.* at ¶ 17.

The Purchase Agreement contained implied warranties of merchantability, fitness for a particular purpose and warranties arising from course of dealing or usage of trade.  *See id.* at

-3-

¶ 18.  The Purchase Agreement also contained several express warranties, including a performance warranty that the Equipment would perform in accordance with the performance requirements as set forth in the specifications, that the Equipment would be designed and manufactured to conform to the specifications, and that the Equipment would be merchantable, of good material and workmanship, free from defects and fit and sufficient for the intended purpose.  *See id.* at ¶ 19.

Plaintiff is the assignee of all of GE's rights, title and interest in the Purchase Agreement and is the sole member of the current owner in fee simple of the Waterford Facility, MPM Silicones, LLC.  *See* Amended Complaint at ¶ 20.  Defendant AstroCosmos delivered and installed one tantalum-lined vessel in April or May 2001.  *See id.* at ¶ 21.  Due to Defendant AstroCosmos' fault, the delivery and installation of the tantalum-lined vessel were behind the schedule set forth in the Purchase Agreement.  *See id.* at ¶ 22.

Since its installation in 2001, the tantalum-lined vessel has never functioned according to the terms of the Purchase Agreement and has been shut down on numerous occasions for repair. *See id.* at ¶ 23.  The vessel failed within the first eleven months of operation and had to be shut down for repairs.  *See id.* at ¶ 24.  Since that first shut down in April 2002 to the filing of the complaint, the vessel has never operated continuously for a period of more than ten months.  *See id.* at ¶ 25.  Defendant AstroCosmos has undertaken several repair attempts on a number of occasions between April 2002 and May 2006.  *See id.* at ¶ 26.  Since it installed the vessel in 2001, Defendant AstroCosmos has replaced several parts of the vessel.  *See id.* at ¶ 27. Defendant AstroCosmos paid for the replacement parts and repairs, acknowledging that the problems were due to its conduct and were its responsibility.  *See id.* at ¶ 28.

-4-

On repeated occasions in March 2005 and thereafter, Defendant AstroCosmos admitted that the vessel was manufactured in a defective manner and that it could not function for its intended and/or particular purpose.  *See id.* at ¶ 29.  In March 2005 and on several occasions thereafter, GE requested that Defendant AstroCosmos replace the vessel.  *See id.* at ¶ 30.

In July 2005, Defendant AstroCosmos modified the Purchase Agreement and provided an additional warranty of future performance for one year from June 2005 that, if the vessel failed within one year, Defendant AstroCosmos would replace the vessel.  *See* Amended Complaint at ¶ 31.  The vessel failed shortly after June 2005, and GE asked Defendant AstroCosmos to manufacture and deliver a new vessel.  *See id.* at ¶ 32.

During 2005, GE and Defendant AstroCosmos had several meetings regarding the design, manufacture, inspection, testing, installation and operation of a replacement vessel to be supplied at Defendant AstroCosmos' cost.  *See id.* at ¶ 33.  In or around November 2005, GE and Defendant AstroCosmos came to an agreement relating to the replacement vessel ("Replacement Agreement").  *See id.* at ¶ 34.  The Replacement Agreement provided that Defendant AstroCosmos would design, manufacture, inspect, test and install a replacement tantalum-lined weak acid reactor with what Defendant AstroCosmos described as "better technology" and continue to repair the existing vessel until the replacement vessel could be installed.  *See id.* at ¶ 35.

The Replacement Agreement also provided that, in exchange for Defendant AstroCosmos' agreement to provide a new tantalum-lined weak acid reactor and for continuing to repair the existing one, GE would award Defendant AstroCosmos, Defendant Carbone Lorraine Equipements Genie Chimique ("CLEGC") and certain of their affiliates preferred vendor status

for identified projects.  *See id.* at ¶ 36.

From November 2005 through May 2006, GE and Defendant AstroCosmos had several meetings about the design, manufacture, inspection, testing, installation and operation of the replacement vessel under the terms of the Replacement Agreement; Defendant AstroCosmos began performance under the terms of the Replacement Agreement; and GE awarded certain projects to Defendant AstroCosmos, Defendant CLEGC and/or certain of their affiliates pursuant to the preferred vendor status arrangement.  *See id.* at ¶ 37.  Plaintiff is the assignee of GE's rights, title and interest in the Purchase Agreement and in the Replacement Agreement, *see id.* at ¶ 38, and is the assignee of all of GE's rights and claims of any nature against any third parties, *see id.* at ¶ 39.

In or around April 2006, Defendant CLEGC requested an inspection of the existing vessel at the Waterford Facility.  *See* Amended Complaint at ¶ 40.  In or around May 2006, Defendants AstroCosmos and CLEGC conducted an inspection of the existing vessel at the Waterford Facility.  *See id.* at ¶ 41.  On or about May 18, 2006, Defendant AstroCosmos' repair crew arrived at the Waterford Facility to begin a round of repairs, which Defendant AstroCosmos had estimated would take four to five weeks to complete.  *See id.* at ¶ 42.

In or around June 2006, GE met with Defendants AstroCosmos and CLEGC.  At that meeting, Defendants took the position, for the first time, that GE was at fault for the performance failures because of the hydrochloric acid process that GE conducted in the tantalum-lined vessel. *See id.* at ¶ 43.  These were the same performance failures that Defendant AstroCosmos had previously admitted were due solely to its defective manufacturing.  *See id.*  After the meeting, Defendant AstroCosmos refused to design, manufacture, inspect and test the replacement

tantalum-lined weak acid reactor and refused to continue to repair the existing vessel as required under the terms of the Replacement Agreement. *See id.* at ¶ 44.

### III. DISCUSSION

**A.      Standard of review**

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). As the Supreme Court explained in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), Rule 8's pleading standard does not require "detailed factual allegations," but it does require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." *Id.* at 555 (citations omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, No. 07-1015, — U.S. —, 129 S. Ct. 1937, 1949 (2009) (quoting [*Twombly*, 550 U.S.], at 557, 127 S. Ct. 1955).

As the Supreme Court explained in *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting [*Twombly*, 550 U.S.], at 570, 127 S. Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing [*Twombly*, 550 U.S.], at 556, 127 S. Ct. 1955).

Furthermore, the Court stated that there are "[t]wo working principles [that] underlie [its] decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions . . . [and] [s]econd, only a complaint

that states a plausible claim for relief survives a motion to dismiss. . . ." *Id.* at 1949-50 (internal

citations omitted).  The Court also stated that

> [d]etermining whether a complaint states a plausible claim for
> relief will . . . be a context-specific task that requires the reviewing
> court to draw on its judicial experience and common sense. . . . But
> where the well-pleaded facts do not permit the court to infer more
> than the mere possibility of misconduct, the complaint has alleged
> – but it has not "show[n]" – "that the pleader is entitled to relief."
> Fed. R. Civ. Proc. 8(a)(2).

*Id.* at 1950 (internal quotation and citations omitted).

Therefore, the Court instructed that, "[w]hen there are well-pleaded factual allegations, a

court should assume their veracity and then determine whether they plausibly give rise to an

entitlement to relief." *Id.*

Finally, when addressing a motion to dismiss, "the court may, without converting the

motion to dismiss into a motion for summary judgment, consider (1) any documents relied on

and/or referenced in the complaint (even if those documents are not attached to the complaint, if

those documents are provided by defendants in their motion to dismiss) . . . ." *Richards v.

Goord*, No. 9:04-CV-1433, 2007 WL 201109, *5 (N.D.N.Y. Jan. 23, 2007) (footnote omitted).

Applying this two-part plausibility standard to Plaintiff's amended complaint, the Court

must now determine whether Plaintiff's claims are sufficient to withstand Defendant

AstroCosmos' motion to dismiss.


**B.     Plaintiff's tort claims**

"Under New York law, the assignment of the right to assert contract claims does not

automatically entail the right to assert tort claims arising from that contract." *Banque Arabe et*

*Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 151 (2d Cir. 1995). However, "New York law does not require specific boilerplate language to accomplish the transfer of causes of action sounding in tort." *Id.* Instead, "'any act or words are sufficient which "show an intention of transferring the chose in action to the assignee."'" *Id.* at 151-52 (quotation omitted).

Defendant AstroCosmos argues that Plaintiff has not pled "that it received an assignment of any claims other than the breach of contract claims." *See* Defendant's Memorandum of Law at 20. Despite this assertion, Plaintiff's amended complaint clearly states that it "is the assignee of all of Silicones business unit of GE's rights and **claims of any nature** against any third parties." *See* Amended Complaint at ¶ 39 (emphasis added). The Court finds that the use of the phrase "any nature" to define the claims assigned is sufficient to demonstrate an intention to transfer all claims, including those sounding in tort. Therefore, the Court denies Defendant AstroCosmos' motion to dismiss Plaintiff's tort claims on this ground.

**C.      Count One – Breach of the Purchase Agreement**

A four-year statute of limitations governs claims that arise under New York's Uniform Commercial Code. *See Int'l Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 240 (S.D.N.Y. 2007) (citing N.Y. U.C.C. § 2-275(1) (McKinney's 1962)). "The general rule is that a cause of action sounding in contract accrues when the act complained of occurs." *Zielinski v. Alfa-Laval, Inc.*, No. CIV-86-296E, 1989 WL 29482, *2 (W.D.N.Y. Mar. 27, 1989) (citation and footnote omitted).

An exception to this general rule is the doctrine of equitable estoppel. "[E]quitable

estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit." *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 50 (2d Cir. 1985) (citations omitted).  For example, plaintiffs have invoked this doctrine "where the defendant misrepresented the length of the limitations period or in some way lulled the plaintiff into believing that it was not necessary for him to commence litigation." *Id.* (citations omitted).

To support its claim that Defendant AstroCosmos should be equitably estopped from raising a statute-of-limitations defense, Plaintiff argues that, in reliance on Defendant AstroCosmos' promises to repair the defects in the equipment, Plaintiff delayed filing this action. Plaintiff's reliance on this so-called "repair doctrine" is misplaced.  As the court noted in *Zielinski*, this doctrine "has been endorsed in relatively few jurisdictions." *Zielinski*, 1989 WL 29482, at *4 (citation omitted).  Moreover, "such equitable doctrine represents neither a recent nor a vital trend in the law." *Id.*  Furthermore, in *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir. 1979), the court held that "New York . . . hold[s] that attempts by the seller to remedy defects giving rise to the cause of action do not toll the U.C.C.'s four-year period of limitations." *Id.* at 743 (citing *Thalrose v. General Motors*, 8 U.C.C. Rep. Serv. 1257, *Aff'd. without opinion*, 41 A.D.2d 906, 343 N.Y.S.2d 303 (1st Dept. 1973)).

Since Defendant AstroCosmos' alleged breach of the Purchase Agreement occurred in April 2002 and the "repair doctrine" does not toll the applicable limitations period, the Court concludes that Plaintiff's first cause of action for breach of the Purchase Agreement is time-

barred; and, therefore, the Court grants Defendant AstroCosmos' motion to dismiss this claim.[3]


**D.      Count Two – Breach of the Replacement Agreement**

With respect to the Replacement Agreement, there are three issues that the parties

dispute: (1) whether the Replacement Agreement was a new agreement or was a modification of

the Purchase Agreement; (2) whether a written Replacement Agreement exists and; if not, (3)

whether there is an enforceable oral Replacement Agreement based on the doctrine of partial

performance.


***1. New agreement or modification of the Purchase Agreement?***

Plaintiff contends that the Replacement Agreement is a new agreement, not a

modification of the Purchase Agreement.  Defendant AstroCosmos, on the other hand, contends

that the Replacement Agreement is a modification of the Purchase Agreement.  The

characterization of the Replacement Agreement is only important if the Replacement Agreement

is an oral agreement.

If the Court were to determine that the Replacement Agreement was an oral agreement

and that the Replacement Agreement was a modification of the Purchase Agreement, then

Plaintiff's claim would fail.  Pursuant to paragraph 24.2 of the Purchase Agreement, "[n]o

amendment to this Agreement shall be effective unless it is in writing and signed by duly

authorized representatives of both parties."  *See* Declaration of Harold L. Kofman dated August

---

[3] The Court's conclusion regarding the inapplicability of equitable estoppel and the repair
doctrine applies to all of Plaintiff's claims.

17, 2007 ("Kofman Decl."), at Exhibit "A."  Therefore, under this paragraph, no oral

modification of the Purchase Agreement would be enforceable.  Since this a motion to dismiss,

and to avoid dismissal of count two, the Court will accept Plaintiff's assertion that the

Replacement Agreement is a new agreement and not merely a modification of the Purchase

Agreement.


   ### 2. Written or oral agreement?

   Assuming that the Replacement Agreement is a new agreement, separate and distinct

from the Purchase Agreement, the Court must decide whether the e-mail exchange between the

parties, *see* Kissane Declaration dated October 1, 2007 ("Kissane Decl."), at Exhibit "O," is

sufficient to create a written agreement.  Under § 2-201(1) of New York's Uniform Commercial

Code, "a contract for the sale of goods for the price of $500.00 or more is not enforceable unless

an authorized agent of the defendant has signed a writing indicating the existence of the

contract."  *Radix Org., Inc. v. Mack Trucks, Inc.*, 602 F.2d 45, 47 (2d Cir. 1979).

   Plaintiff asserts that the November 19, 2005 e-mail of Gerhard Doerr to John Drake

constitutes the Replacement Agreement.[4]  That e-mail states as follows:

> John,
>
> This is to confirm that we have reached an agreement combining
> AC's commitment to replace the Waste Acid Reactor (Waterford)
> with GE's commitment to award business to AC and/or CLEGC
> (Carbone Lorraine's Process Equipment Division).

---

[4] Although Plaintiff did not attach the Replacement Agreement to its amended complaint, since the Replacement Agreement is necessary to its claims, the Court may consider the writing which Plaintiff contends constitutes the Replacement Agreement even though this is a motion to dismiss.

1.    AC to repair the existing reactor – allowing GE Silicones to operate the reactor.  GE Silicones will bear 50% of the repair cost including testing.

2.    AC will fabricate a new reactor – baffles from the existing reactor will be re-used.  AC will bear the cost of the new reactor – GE will bear the cost of removing the existing reactor [f]rom its location and installing the new reactor in that location.

3.    GE will commit to award the following business to CLEGC and/or AC:

> a.    ULTEM project
>       Lot #1:        4 Ti-clad reactors + 1
>       sold Ti column (see pre-agreement
>       dated 8.Nov-05)
>       Lot#2:         Ti Heat Exchangers
>       Lot #3:        Ti Piping & Fittings
>       Lot #4:        PTFE-lined Piping
>       Lot #5:        PTFE-lined column
>       Lot #6:        Graphite Heat Exchangers
> b.    LEXAN
>       Ta-Clad Reactor System #5
> c.    Any other business GE would award in 2006 & 2007 if suitable for CLEGC and/or AC.

For this business CLEGC and/or AC would have a 'Preferred Vendor Status' = Rights of first refusal.

Precondition:
CLEGC and/or AC must be technically qualified and competitive.

You and I will have to work out the contract and submit it to the respective management for approval and signature.

*See* Kissane Decl. at Exhibit "O."

Agreements to agree "are not recognized as binding obligations under New York law."

*Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02 Civ. 2628, 2002 WL 31398933, *2

(S.D.N.Y. Oct. 24, 2002) (citing *Miller v. Tawil*, 165 F. Supp. 2d 487, 492 (S.D.N.Y. 2001)

("There is a strong presumption against finding binding obligation in agreements which include open terms, **call for future approvals** and **expressly anticipate future preparation and execution of contract documents**." (emphasis added))) (other citation omitted).  As the court noted in *Miller v. Tawil*, 165 F. Supp. 2d 487 (S.D.N.Y. 2001), "[t]he Second Circuit has established a framework for analyzing whether a written instrument constitutes a binding preliminary agreement or an unenforceable agreement to agree." *Id.* at 491 (citing *Adjustrite Sys. v. Gab Bus. Servs.*, 145 F.3d 543, 547 (2d Cir. 1998)) (other citation omitted).

"'Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract.'" *Id.* (quoting *Adjustrite*, 145 F.3d at 547 (citing *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996))).  Under some circumstances, however, preliminary agreements can generate contractual obligations.  *See id.* One example of such an agreement is "where the parties have agreed on all points that require negotiation including whether to be bound, but agree to memorialize their agreement in a more formal document." *Id.* (citation omitted).  "Such an agreement is fully binding; it is 'preliminary only in form – only in the sense that the parties desire a more elaborate formalization of the agreement.'" *Id.* (quoting *Tribune*, 670 F. Supp. at 498).

Furthermore, "[t]he Second Circuit has interpreted New York law as establishing a four-part test for determining whether the parties intended their written statements to constitute a binding contract." *Id.* (citing *Adjustrite*, 145 F.3d at 549; *Tribune*, 670 F. Supp. at 497-98).  These factors are: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the

agreement at issue is the type of contract that is usually committed to writing." *Id.* (citing *Tribune*, 670 F. Supp. at 499-503).

"The first factor, the language of the agreement, is 'the most important.'" *Id.* at 492 (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989)).  In this case, the language of Mr. Doerr's November 19, 2005 e-mail to Mr. Drake demonstrates that his e-mail was not a fully binding preliminary agreement.  Although Mr. Doerr used the word "Agreement" in the subject line of his e-mail and noted that this e-mail "confirm[s] that we have reached an agreement," it is clear that, when read in its entirety, this e-mail does not constitute an agreement under New York law.  Most particularly, the last line of the e-mail, in which Mr. Doerr stated that he and Mr. Drake would have to "**work out the contract** and submit it to the respective management **for approval and signature**[,]" *see id.* (emphasis added), makes clear that this e-mail is not a formal memorialization of an intent to be bound.  To the contrary, this e-mail indicates that the parties still have to "work out the contract" and that, before the parties are bound, they have to submit the contract to management for approval.

Furthermore, it is clear from subsequent e-mails in this exchange between Mr. Doerr and Mr. Drake that the parties had not agreed to all of the terms of the alleged contract.  In an e-mail dated November 21, 2005, Mr. Drake wrote to Mr. Doerr that, although GE is "in agreement to move forward" as Mr. Doerr proposed, there were "two clarifications" that he "planned to include on the proposal," and he indicated that he would begin to work with GE's legal counsel to formalize Mr. Doerr's proposals and that he would call later "to confirm that GE was "ready to move forward as [he had] outlined." *See* Kissane Decl. at Exhibit "O."

One month later, in an e-mail dated December 22, 2005, Mr. Drake wrote to Mr. Doerr

that he was forwarding "the current draft of the formal agreement" and informed him that "[t]his

draft is still being reviewed internally at GE, so [GE] may make some changes as well . . . ."  He

also asked Mr. Doerr to "review [the draft] and send [him] any comments that [he might] have."

In addition, he stated that he would set up a call with Mr. Doerr and others "to go through a

detailed review of any questions, additions or changes that [Mr. Doerr might] have."  *See id.*

Finally, Mr. Drake stated that he thought the parties were "moving forward to a successful

closure of this issue, but want[ed] to make sure [the parties] close on the formal contract as soon

as possible."  *See id.*

Given the "'strong presumption against finding binding obligation in agreements which

include open terms, call for future approvals and expressly anticipate future preparation and

execution of contract documents,'" *Miller*, 165 F. Supp. 2d at 492 (quotation omitted), it is clear

that the e-mail exchange between Mr. Doerr and Mr. Drake does not constitute a written

contract.[5]

### 3. Applicability of partial performance exception to § 2-201(1)

Since the Court has concluded that the e-mail exchange does not constitute a written

Replacement Agreement, the Court must next determine whether the "partial performance"

exception to § 2-201(1)'s writing requirement applies to this case.

Section 2-201(3), which allows for this exception, provides that

---

[5] The Court notes that the fact that this type of contract is ordinarily committed to a formal writing and that the e-mail exchange indicates that the parties anticipated further negotiations before they would agree to a final version of a written contract also support a finding that this e-mail exchange was nothing more than a preliminary non-binding agreement.

-16-

[a] contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2-606).

N.Y. U.C.C. § 2-201(3).

Plaintiff contends that, under the terms of the Replacement Agreement, Defendant AstroCosmos agreed to "design, manufacture, inspect, test and install a replacement tantalum-lined weak acid reactor at the Waterford Facility . . . [and] agreed to repair the existing tantalum-lined vessel at the Waterford Facility until the replacement tantalum-lined weak acid reactor was delivered." *See* Amended Complaint at ¶¶ 59-60. Plaintiff also claims that "[t]he Replacement Agreement . . . provided that, in exchange for AstroCosmos' agreement to provide a new tantalum-lined weak acid reactor and for continuing to repair the existing Equipment, AstroCosmos, CLEGC and certain of their affiliates would be awarded preferred vendor status for identified GE projects." *See id.* at ¶ 36. Finally, Plaintiff asserts that "AstroCosmos began performance under the terms of the Replacement Agreement, and in reliance thereon, GE awarded certain projects to AstroCosmos, CLEGC and/or certain of their affiliates pursuant to

-17-

their preferred vendor status arrangement." *See id.* at ¶ 37.

        None of the cases that the parties cite is directly on point, and they all involve a

modification of a written agreement, which Plaintiff asserts is not at issue here.  Moreover, both

*Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338 (1977), and *Travis v. Fallani & Cohn*, 292 A.D.2d

242 (1st Dep't 2002), involve divisible units – in *Rose* plots of real property and in *Travis* various

decorative designs – whereas in this case, the only product at issue is a single replacement

tantalum-lined weak acid reactor.

        The distinction between a single indivisible product and divisible units of sale is

important because "'[p]artial performance' as a substitute for the required memorandum can

validate the contract only for the goods which have been accepted or for which payment has been

made and accepted."  N.Y. U.C.C. § 2-201 cmt. 2.  As the court noted in *Beautiful Jewellers*

*Private Ltd. v. Tiffany & Co.*, No. 06 Civ. 3085, 2007 WL 867202 (S.D.N.Y. Mar. 21, 2007),

"[w]hile the UCC does not specifically address the effect of a partial payment made toward the

purchase of a single, indivisible good, "'the weight of authority is clearly to the effect that such

payment will render an indivisible oral contract enforceable, notwithstanding the Statute of

Frauds."'" *Id.* at *3 (quoting *Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 923

(S.D.N.Y. 1984) (quoting *Thomaier v. Hoffman Chevrolet, Inc.*, 410 N.Y.S.2d 645, 648-49 (App.

Div. 1978))).  The court explained that "[t]he reasoning is that if the subject of a contract is an

**indivisible unit, even part performance under the contract tends to prove the existence of**

**the entire contract**." *Id.* (citing *Starr v. Freeport Dodge, Inc.*, 282 N.Y.S.2d 58, 60-61 (Dist. Ct.

1967)) (emphasis added).

        In this case, unlike in *Beautiful Jewellers*, there is no doubt that the replacement

tantalum-lined weak acid reactor is a single indivisible unit.  What is at issue, however, is whether both parties partially performed under the Replacement Agreement.  In its amended complaint, Plaintiff alleges that Defendant "AstroCosmos began performance under the terms of the Replacement Agreement," *see* Amended Complaint at ¶ 37, and that, "in reliance [on Defendant AstroCosmos performance], GE awarded certain projects to AstroCosmos, CLEGC and/or certain of their affiliates pursuant to their preferred vendor status arrangement," *see id.*

Under the reasoning in *Beautiful Jewellers*, – that, when the contract is for an indivisible unit, "partial performance under the contract tends to prove the existence of the entire contract," *Beautiful Jewellers*, 2007 WL 867202, at *3 – these allegations are sufficient to withstand Defendant AstroCosmos' motion to dismiss because, when accepted as true, they "'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quotation omitted).  Therefore, the Court denies Defendant AstroCosmos' motion to dismiss Plaintiff's second count for breach of the Replacement Agreement insofar as that motion is based on the argument that the Replacement Agreement is unenforceable under the Statute of Frauds.[6]

_____

[6] Alternatively, Defendant AstroCosmos argues that Plaintiff does not have standing to bring a claim for breach of the Replacement Agreement because it is clear from the "draft" Replacement Agreement that the parties contemplated that the rights under the Replacement Agreement would not be assignable absent the consent of both parties.  To support this argument, Defendant AstroCosmos draws the Court's attention to two drafts of the Replacement Agreement, both of which contain the following provision – "This Agreement may not be assigned by either party without the prior written consent of the other party."  *See* Kofman Decl. at Exhibits "B" and C."  Even if the Court were to consider these documents, they do nothing more than create an issue of fact, which the Court cannot resolve on a motion to dismiss.  On the one hand, there is the e-mail exchange between Mr. Doerr and Mr. Drake, on which Plaintiff relies to support its position that the parties had entered into a Replacement Agreement.  Nowhere in that e-mail exchange is there any mention of assignment or non-assignment.  On the other hand, there are the two drafts of the Replacement Agreement, both of which contain non-assignability clauses.  Therefore, to the extent that Defendant AstroCosmos' motion to dismiss

(continued...)

**E.    Count Three – Fraudulent inducement related to the Purchase Agreement**

"It is well established that New York courts will not entertain fraud claims that are merely incidental to claims for breach of contract." *Rosen v. Spanierman*, 894 F.2d 28, 35 (2d Cir. 1990) (citation omitted).  However, "[a] claim for fraudulent inducement is separate and  distinct from a claim for breach of contract under New York law, and a plaintiff may plead both causes of action." *Id.* (citations omitted).  "The six year period of limitations for fraud applies to a claim for fraudulent inducement of contract; 'the cause of action accrues when the document is executed and when the party alleging fraud has given consideration and thus suffered damage.'" *Triangle Underwriters, Inc.*, 604 F.2d at 748 (quotation omitted).

Since Defendant AstroCosmos and GE entered into the Purchase Agreement in October 1999, Plaintiff's fraudulent inducement claim accrued at that time.  Thus, the six-year statue-of-limitations period expired in October 2005, prior to Plaintiff filing this action in 2007.

Furthermore, Plaintiff's argument that it did not discover the fraud until it received the June 23, 2006 letter from Defendant's CEO Jo Jolitz is specious.  In its amended complaint, Plaintiff alleges that Defendant AstroCosmos admitted in March 2005 that the tantalum-lined reactor was defective.  Thus, at the very latest, Plaintiff was aware of the alleged fraud in March 2005, more than two years before it filed this action.

Therefore, whether the Court measures the statute of limitations from the time of the commission of the fraud, October 1999, or from the discovery of the fraud, at the latest in March 2005, the statute-of-limitations period expired prior to Plaintiff filing this action.  Accordingly,

---

[6](...continued)
relies upon this argument, the Court denies the same.

the Court grants Defendant AstroCosmos' motion to dismiss Plaintiff's fraudulent inducement

claim as time-barred.


**F.      Count Four – negligent misrepresentation related to the Purchase Agreement**

"[A] cause of action . . . for property loss owing to negligence in the performance of

contracts for the *sale of goods* [is] governed by the four-year statute of limitations of section 2-

725 of New York's Uniform Commercial Code ("UCC"), which section controls suits for

breaches of sales contract." *Zielinski*, 1989 WL 29482, at *1.  Moreover, "[i]nsofar as a

contractual statute of limitations applies to the negligent performance of a contract, it follows

that a contractual concept of accrual applies also." *Id.* at *2 (citation omitted).  "The general rule

is that a cause of action sounding in contract accrues when the act complained of occurs." *Id.*

(citation and footnote omitted).

> Under New York law, the elements of a claim for negligent
> misrepresentation are that:
>
> "(1) the defendant had a duty, as a result of a special relationship,
> to give correct information; (2) the defendant made a false
> representation that he or she should have known was incorrect; (3)
> the information supplied in the representation was known by the
> defendant to be desired by the plaintiff for a serious purpose; (4)
> the plaintiff intended to rely and act upon it; and (5) the plaintiff
> reasonably relied on it to his or her detriment."

*EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 280 (S.D.N.Y. 2004)
(quoting *Greenberg v. Chrust*, 198 F. Supp. 2d 578, 584 (S.D.N.Y. 2002) (citing *Hydro
Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000))).

The New York Court of Appeals has determined that "'a special duty giving rise to a

negligent misrepresentation claim must arise out of a contract or some . . . relationship

-21-

approaching . . . privity of contract.'" *Id.* at 281 (quotation omitted).  A court determines whether a "near privity" relationship exists by considering the following factors: "(1) defendant's awareness that the statement in question was to be used for a particular purpose, (2) reliance on the statement by some identifiable parties in furtherance of that purpose, and (3) some conduct linking defendant to the parties and evincing defendant's awareness of the reliance." *Id.* (citation omitted).

"The next step in New York's negligent misrepresentation analysis is to determined [sic] whether this near-privity relationship imparted a duty on [the defendant] to provide correct information." *Id.*  "Under New York law, a statement made in the context of an arms-length commercial transaction, without more, cannot give rise to such a duty." *Id.* (citation and footnote omitted).  Instead, "an arms-length commercial transaction can only give rise to a negligent misrepresentation claim if a special relationship exists between the parties such that plaintiff's reliance on defendant's representation was justifiable." *Id.* (citation omitted).  Such "[a] special relationship can arise where the defendant either (1) possesses 'unique or specialized expertise' or (2) occupies a 'special position of confidence and trust' with the injured party." *Id.* (citation omitted).

In its amended complaint, Plaintiff asserts that Defendant "AstroCosmos provided false information to GE including, but not limited to, that the tantalum-lined vessel would perform in a superior manner compared to a brick-lined weak acid reactor . . . [and that] GE reasonably relied upon the false information provided by [Defendant] AstroCosmos **in entering into the Purchase Agreement** with [Defendant] AstroCosmos."  *See* Amended Complaint at ¶¶ 79-80 (emphasis added).

Since Plaintiff asserts that Defendant AstroCosmos' negligent misrepresentations induced it to enter into the Purchase Agreement, its negligent misrepresentation claim accrued, at the very latest, in October 1999, when the parties entered into the Purchase Agreement.  If, as Plaintiff contends, these alleged misrepresentations were not related to the performance of the contract but to Defendant AstroCosmos' experience with tantalum-lined reactors, the three-year statute of limitations for causes of action sounding in negligence applies to this claim.  *See Gianakakos v. Commodore Home Sys., Inc.*, 285 A.D.2d 907, 908 (3d Dep't 2001) (holding that "causes of action sounding in negligence . . . are subject to the three-year Statutes of Limitations of CPLR 214(4) . . . and accru[e] upon the date of injury" (citations omitted)).  Thus, the statute of limitations expired in October 2002, well before Plaintiff commenced this action.[7]  Therefore, the Court grants Defendant AstroCosmos' motion to dismiss Plaintiff's negligent misrepresentation claim as time-barred.

**G.     Count Seven – professional negligence and engineering malpractice**

A claim for professional malpractice accrues on the date on which the defendant committed the alleged malpractice.  *See Glamm v. Allen*, 57 N.Y.2d 87, 93 (1982) (citation omitted).  This accrual date does not change even if subsequent events toll the statute-of-limitations period.  *See id.*  The doctrine of "continuous treatment" or "continuous representation" may toll the statute of limitations during the period in which the representation continues.  *See id.*  This "'rule recognizes that a person seeking professional assistance has a right

_____

[7] If the allegedly negligent misrepresentations related to the performance of the contract, the four-year statute of limitations of New York's UCC would apply and the statute of limitations would have expired in October 2003, still well before Plaintiff commenced this action.

to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered . . . .'" *Id.* at 93-94 (internal quotation omitted). However, "[w]hen that relationship ends, for whatever reason, the purpose for applying the continuous representation rule no longer exists." *Id.* at 94.

Although courts have extended this doctrine to professionals other than physicians, such as accountants, investment advisors, attorneys, and architects, "the Second Circuit has refused to extend the continuous treatment doctrine to a manufacturer of machinery." *Podgoretz v. Shearson Lehman Bros., Inc.*, Nos. 86CV2681, 86CV2996, 1994 WL 1877200, *5 (E.D.N.Y. Mar. 23, 1994) (citing *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 744-45 (2d Cir. 1979)). Furthermore, the Second Circuit has "suggested that the doctrine should only apply to professionals." *Id.* (citing *Rosen v. Spanierman*, 711 F. Supp. 749 (S.D.N.Y. 1989), *vacated in part on other grounds*, 894 F.2d 28 (1990)) (footnote omitted). As the court noted in *Triangle Underwriters, Inc.*, although

> [t]he manufacturer of a large, complicated, and expensive piece of machinery may be presumed to know more about its workings than the purchaser, . . . However, to lift the continuous treatment concept from its narrow origin of personal services rendered by a professional defendant to a lay patient or client, and apply it generally to the law of commercial sales, would open Pandora's box, and create uncertainty where well-defined statutes of limitations now offer repose.

*Triangle Underwriters, Inc.*, 604 F.2d at 746.

In light of the Second Circuit's refusal to extend the continuous treatment doctrine to manufacturers of machinery, such as Defendant AstroCosmos, the Court finds that the

continuous treatment doctrine is inapplicable to this case.  Furthermore, because Plaintiff's engineering malpractice claim is based on the design of the tantalum-lined reactor, this claim, accrued, at the very latest, at the time that the reactor was delivered in April or May 2001.  Thus, the statute-of-limitations period expired in April or May 2004, three years before Plaintiff commenced this action.  Therefore, the Court grants Defendant AstroCosmos' motion to dismiss Plaintiff's professional malpractice claim as time-barred.


**H.      Count Eight – strict products liability**

Generally, "causes of action sounding in . . . strict products liability are subject to the three-year Statute[] of Limitations of CPLR 214 . . . (5) and accrue[] upon the date of injury[.]" *Gianakakos*, 285 A.D.2d at 908 (citations omitted).  However, "a cause of action . . . for property loss owing to negligence in the performance of contracts for the *sale of goods* [is] governed by the four-year statute of limitations of section 2-725 of New York's Uniform Commercial Code ("UCC"), which section controls suits for breaches of sales contracts." *Zielinski*, 1989 WL 29482, at *1.  Moreover, "[i]nsofar as a contractual statute of limitations applies to the negligent performance of a contract, it follows that a contractual concept of accrual applies also." *Id.* at *2 (citation omitted).  "The general rule is that a cause of action sounding in contract accrues when the act complained of occurs." *Id.* (citation and footnote omitted).

In its amended complaint, Plaintiff alleges that

> [Defendant] AstroCosmos knew or should have known that the
> Equipment was expected to be part of a complicated and integrated
> system at the Waterford Facility and that the tantalum-lined vessel
> actually delivered was thereafter operated without substantial
> change in its construction as of the time that [Defendant]

> AstroCosmos delivered it.  [Defendant] AstroCosmos also knew or
> should have known that a failure of the tantalum-lined vessel could
> lead to substantial disruption at the Waterford Facility and that
> such failure posed a serious threat to persons and property.  The
> defective design of the Equipment performed by [Defendant]
> AstroCosmos caused an injury to property and, by disrupting the
> Waterford Facility operations, constituted an appreciable danger to
> persons and other property.

*See* Amended Complaint at ¶ 109.

Plaintiff filed this action on May 25, 2007.  *See* Dkt. No. 1.  Therefore, Plaintiff's strict products liability claim is time-barred with respect to any damage that the failure of the tantalum-lined reactor caused to property other than the reactor itself which occurred prior to May 25, 2004.  At this early stage of the litigation, the Court is unable to determine what the exact nature of the property damage is and whether any of that damage occurred within three years of the filing of this action.  Accordingly, the Court denies Defendant AstroCosmos' motion to dismiss Plaintiff's strict products liability claim insofar as that claim encompasses property damage that occurred after **May 25, 2004**, and grants Defendant AstroCosmos' motion to dismiss this claim as time-barred with respect to any property damage that occurred prior to that date.

I.      **Count Nine – breach of implied warranties**

As noted, a four-year statute of limitations governs claims that arise under New York's Uniform Commercial Code.  *See Int'l Design Concepts, LLC*, 486 F. Supp. 2d at 240 (citing N.Y. U.C.C. § 2-275(1) (McKinney's 1962)).  A breach of warranty claim under the U.C.C. "is deemed to accrue when delivery is made unless the warranty explicitly extends to future performance, in which case it accrues 'when the breach is or should have been discovered' (UCC 2-275[2])."

*Gianakakos*, 285 A.D.2d at 907.  In this context, "'[t]he term "explicit" has been explained as plain language which is distinctly stated, clear and unequivocal to the point that there is no doubt as to its meaning.'"  *Port Auth. of N.Y. & N.J. v. Allied Corp.*, 914 F. Supp. 960, 962 (S.D.N.Y. 1995) (quotation omitted).  Since, "an implied warranty by definition embodies no 'explicit' guarantees . . . [a] plaintiff's . . . implied warranty cause[] of action necessarily accrue[s] as a matter of law at about the time of tender of delivery . . . ."  *Zielinski*, 1989 WL 29482, at *3 (internal citation and footnote omitted).  In other words, "[t]he exception to the tender of delivery rule – by which accrual would occur at the time of discovery of the breach of warranty – can not apply because the necessary predicate of an explicit guarantee of future performance is absent."  *Id.*

Defendant AstroCosmos delivered the tantalum-lined reactor in April or May 2001.  Since the tender-of-delivery rule applies with respect to implied warranties, Plaintiff's claim accrued and the four-year statute of limitations began to run in April or May 2001 and expired in April or May 2005, well before Plaintiff commenced this action.  Therefore, the Court grants Defendant AstroCosmos' motion to dismiss Plaintiff's breach of implied warranties claim as time-barred.

**J.      Count Ten – breach of express warranties**

Since this claim arises under New York's Uniform Commercial Code, a four-year statute of limitations applies.  Unless the warranty explicitly extends to future performance, a breach of warranty claim accrues at the time of delivery.  *See Gianakakos*, 285 A.D.2d at 907.  Moreover, because "all warranties in some way apply to the future performance of goods, the normal four

year limitations period generally is not extended pursuant to the future performance exception

unless the warranty specifically refers to a future time." *Port Auth. of N.Y. & N.J.*, 914 F. Supp.

at 963 (citation omitted).

In most cases in which courts have found that an express warranty explicitly extended to

future performance, "the warranty specifically made reference to future time, such as a 'lifetime'

warranty . . . or a warranty that a product would work satisfactorily 'at all times' . . . ." *Holdridge*

*v. Heyer-Schulte Corp. of Santa Barbara*, 440 F. Supp. 1088, 1103 (N.D.N.Y. 1977) (internal

citations omitted).  However, even when a warranty explicitly extends to future performance, an

immediate failure of the goods in question would take the case out of that exception.  *See*

*Triangle Underwriters, Inc.*, 604 F.2d at 743 (footnote omitted).  In other words, if a "'breach [is]

discovered almost immediately upon delivery of the machine . . . the statute of limitations, even

with regard to "future performance," [would begin] to run [from the time of that initial breach].'"

*Id.* at 743 n.11 (quotation omitted).

Furthermore, Plaintiff's reliance on the so-called "repair doctrine" to toll the running of

the statute of limitations under UCC § 2-725 is unavailing.  The repair doctrine is "a

particularized species of estoppel whereby the running of the period of limitations for breach of

warranty is equitably tolled if (1) the seller had attempted to make repairs, and (2) the seller had

represented that such repairs would cure the defect." *Zielinski*, 1989 WL 29482, at *3 (citations

omitted).  However, New York courts have not expressly adopted this doctrine.  *See id.*

Although very few jurisdictions have specifically rejected the repair doctrine, relatively

few jurisdictions have endorsed it.  *See id.* at *4 (citations omitted).  Moreover, in *Zielinski*, the

court stated that, "[i]n [its] view[,] the legislative intent behind UCC § 2-725 – that New York's

commercial law be consistent with that of the majority of other states – would be frustrated by

engrafting a minority common law exception to the tolling of the period of limitations for breach

of warranty claims." *Id.* Thus, the *Zielinski* court "opin[ed] that New York's Court of Appeals

would not adopt the repair doctrine . . . ." *Id.*; *see also Triangle Underwriters, Inc.*, 604 F.2d at

743 (noting that "New York and other jurisdictions hold that attempts by the seller to remedy

defects giving rise to the cause of action do not toll the U.C.C.'s four-year period of limitations"

(citations omitted)).

   In this case, Defendant AstroCosmos delivered the tantalum-lined reactor in April or May

2001, and it failed for the first time in April 2002.  Article 9 of the Purchase Agreement sets forth

the various express warranties.  None of the sections in Article 9 includes explicit language that

would indicate that the warranties extend to future performance.  In fact, paragraph 9.3 provides,

in pertinent part, that "[t]he warranties outlined in Sections 9.1 [Performance Warranty] and 9.2

[Workmanship Warranty] shall extend for a period of one (1) year after acceptance by Purchase

of the Equipment."  *See* Purchase Agreement at Article 9, Section 9.3.  Furthermore, Section 9.3

provides that, "[i]n the event of a breach of these warranties during the warranty period Seller

shall without undue delay repair, replace or modify the Equipment so as to correct such warranty

breach, during which time the warranty period shall toll.  Any corrected parts shall be warranted

for one additional year following the date of correction."  *See id.*

   Under Section 9.3, the performance and workmanship warranties extended to May 2002 –

one year after delivery of the tantalum-lined reactor.  The first time the reactor failed was in April

2002 – eleven months after delivery.  Assuming that the failure constituted a breach of the

warranty of either performance or workmanship, there was only one month remaining on the

warranty, which began to run against as soon as the repair was completed.  Furthermore. Section 2-725(1) provides that "[a]n action for breach of contract for sale must be commenced within four years after the cause of action accrued . . . [and although] [b]y original agreement the parties may reduce the period of limitations to not less than one year [they] may not extend it."  N.Y. U.C.C. § 2-725(1).

Since New York has not adopted the repair doctrine, Plaintiff's claim for breach of express warranties, at the latest, accrued in May 2002 and expired in May 2006, a year prior to Plaintiff commencing this action.  Accordingly, the Court grants Defendant AstroCosmos' motion to dismiss Plaintiff's breach of express warranty claim as time-barred.

## IV. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions and oral arguments, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant AstroCosmos' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**; and the Court further

**ORDERS** that Counts 1, 3, 4, 7, 9 and 10 are **DISMISSED IN THEIR ENTIRETY** and Count 8 is **DISMISSED** insofar as it relates to any property damage that occurred prior to May 25, 2004; and the Court further

   **ORDERS** that Plaintiff shall contact Magistrate Judge Homer's chambers within **five**

**days** of the date of this Order to schedule a Rule 16 Conference.[8]


**IT IS SO ORDERED.**


Dated: September 23, 2009
        Syracuse, New York



                                        _____
                                        Frederick J. Scullin, Jr.
                                        Senior United States District Court Judge

---

   [8] As a result of this Memorandum-Decision and Order, Plaintiff's only remaining claims against Defendant AstroCosmos are its claim for breach of the Replacement Agreement (Count 2) and its claim for strict products liability insofar as that claim relates to property damage that occurred after May 25, 2004 (Count 8).